Our next case on calendar is Ward v. State of Alaska, and I think we had some question about whether the attorneys were here, so it's 22-70141 and 70142, but we'll wait a little bit. Looks like everyone is here. Is everyone here who's supposed to be here? As far as I know, you're not. Okay. Great. Then we're ready whenever you are. May it please the Court, I am Lenore Guerin representing the petitioner Margaret Ward who's seated next to my co-counsel Gary Gilbert, and I'd like to reserve five minutes for rebuttal. Margaret Ward supported the sexual harassment claim of her subordinate and opposed the way in which it was being handled. And she was fired in retaliation, actually she was retaliated against before she was fired, and she brought an EEO complaint. The State purports to blame her terminate, or to have investigated her and concluded that she misused State resources in her position, but this is pretext. At the hearing, the State relied on evidence that they tell us that they permitted to be Having failed to present admissible evidence, they have failed in their duty under Texas Department of Community Affairs v. Verdine, which requires the respondent to produce admissible evidence supporting the legitimate non-discriminatory reason. The destruction of the evidence, we think, is strong evidence of pretext. The trial judge sanctioned the State for barring, for this evidence, by saying that she would bar any testimony about any documents that were missing or the reports that purported to summarize these documents. But then she did not adhere to her own sanction, the administrative law judge, she did not adhere to her own sanction and instead permitted testimony that the decision maker relied on this investigation and it showed that she had misused her position and resources. This failure to, the sanction, in our view, was itself inadequate, but the failure to sanction was both an abuse of discretion and, in our view, a reversible error. There exists... When you say that the ALJ allowed evidence about the investigation, are you referring to the Ryan Affidavit? Not only to the Ryan Affidavit, but to his testimony when he was examined. He said he had heard some rumors, so he put good people on it and they investigated it, and on the strength of the investigation, he approved her termination. And how do we know that that's the same investigation that was excluded? It's clear from the context of the... It's clear from the context of the colloquy, first of all, and secondly, we have in evidence the sexual harassment investigation, which does not show a misuse of state resources and does not suggest that Ms. Ward be terminated, but rather suggests that she, well, commands that she receive training in the handling of sexual harassment. So that's how we know that the investigation referred to is the investigation that is referenced in the April 22 letter terminating her and also the memorandum that preceded it on the same day, which purports to state what it is that she did that was a misuse of resources, as to which, in fact, there is no credible evidence. There... So you'd like the ALJ to have drawn an inference about the content of the reports because the exhibits were not there anymore, but you or someone, I don't know who it was back then, counselor for Ms. Ward, were able to see the reports because the reports themselves still existed. They received... There were two reports in question. One was the report of the entity that did the investigation, the Zoruba Company, and we refer to that as the Zoruba Report. That was produced the day before the hearing. So there was no opportunity to look at it, but there was no opportunity to investigate what it purported to summarize. They couldn't bring in Representative Zoruba and say, did this really happen? How do you know? But I'm just wondering, it seems like probably, I mean, it's possible it wasn't, but the most likely thing is that the report was consistent with whatever its exhibits were. It's pretty unlikely that the report says there's no evidence and then the exhibits were entirely evidence or something that totally doesn't matter. Right, but we have... Given that they had the report, I mean, you could have used the report, but you just said there was a discussion, what should we do, and you said we'd rather not have it. So doesn't that suggest that the report was not helpful to you? No, Your Honor, it does not. It suggests that we had no way of disputing what was in the report, because at that time... You would have only wanted to dispute if it was not helpful to you. I'm sorry. I'm thinking that the report was probably not helpful to your client. No, the report was not helpful, but there was no one whom we could then interrogate and say, how do you know this? What evidence do you have? I'll give you a good example of that. One of the things listed in the privilege log that was not available is a Zoruba interview report of their interview with Leola Rutherford, who is considered to be the source of the information that Margaret Ward asked how to purge the contents of the computer. Well, it would have been nice to be able to see that interview report, and you would think that the government would have preserved that interview report to introduce into evidence at a trial, which they claim that that's how they know Margaret Ward purged the computer, because she asked Leola Rutherford how. But we can't see that interview report, because it's gone. We don't know what she actually told Zoruba. And what's the best story you could give about purging the computer? What would you like us to think happened with the computer? Myself being not exactly an expert on the subject, I would be speculating. That said, the computer may have been purged by someone who was doing other work on the computer. Mr. Helm, the computer expert who testified, said it's not obvious how to do it. And as far as he knows, and he apparently asked his colleague as well, according to the report, no one told either Margaret Ward or Lydia Jones how to purge the computer. I would point out that there were backup tapes, and Mr. Helm said he could recover stuff from the backup tapes, but nothing that was on the backup tapes was ever produced by the state, which implies, at least to me, that there was nothing there that would have showed a misuse of government resources. And actually, at this point, I want to point out the famous mailing list, which is also referenced as evidence of when you look at the mailing list, when you look at it closely, which is hard, because it's many, many pages, you discover that on this mailing list, supposedly prepared for Lieutenant Governor Coghill's election campaign, are the Governor Hickle himself, several of Governor Hickle's relatives, several of Governor Hickle's business reports, Cheryl Frasca, Ms. Frasca, who was the Deputy Chief of Staff to Governor Hickle. No, it is not possible to have an honest belief that that document was used to prepare, to solicit support for Lieutenant Governor Coghill if Governor Hickle, his putative opponent, is on that list. You can't have an honest belief of that. Unless the list was copied from something else. Well, the testimony from Wanda Thagard was that this was the list that she prepared. And she then made a disc copy of the list. And she says this is the list that she thought was suspicious because among the names that Ms. Ward suggested be added to this list were bingo parlor operators whom she didn't think Governor Hickle would want to communicate with, although most of us know that in a democracy, politicians try to communicate with pretty much everybody. But she says this is the list that she prepared and the names on it were the ones, or at least some of them, were the ones that Margaret Ward had her add to the list. And therefore, we do know that, we don't know that it is copied from something else. This is the list that supposedly was prepared at Margaret Ward's direction. That's the only testimony about the list. And then how do you explain the spelling mistake on the mailing that was received? We don't actually explain it, but we do know that as early as the fall of 1990, first of all, it's not in evidence. We don't know what was in the envelope. We don't know that it was a fundraiser for Governor Coghill because that's part of the evidence that the state allowed to be destroyed. But secondly, we know that it's a typo. We know that the decision maker, Mr. Ryan, knew about that mistake as early as September 1993, but it concerned him enough, supposedly, to be part of the reason why he asked for investigation. He didn't rely on it. He said he didn't believe that, he didn't believe that the rumors were sufficient to rely upon. In fact, he specifically disclaimed relying on rumors to terminate Ms. Ward. It's a typographical error. There were, it is entirely within the- To avoid violating GERA, I don't know how we're going to say this statute. They don't have to actually have evidence of misuse of government resources. They only need to have believed it. I am so glad you said that. It is true that what is required is honest belief, but this is an action not against Mr. Ryan personally, but against the state of Alaska. If Mr. Ryan's honest belief was based on evidence that was, he never testified that he even read the investigative report. If his- Well, you wouldn't have let him testify to that, right? Or, I don't know. Well, he testified that he relied on the report, so presumably he could have testified that he'd read it, but whether or not he did, if he relied on the investigation and the investigation, in fact, had no solid evidence of what is claimed, then basically he's a cat's paw, and the state has still not had an honest belief in Ms. Ward's- That would be true if the investigators, who I guess are agents of the state, were motivated by an improper purpose, but if they simply did a bad investigation, or an erroneous investigation, and he relied on the erroneous investigation, that doesn't get you to a- We don't actually know, because he said he was told by the people whom he put in charge that this is what the investigation was told. What are you saying, we don't know? We don't know whether it was an incompetent investigation, or it just produced nothing, because he didn't say- My point is that, even assuming that it was, that doesn't get you a violation of the state. I understand that, but if he was told that the investigation showed something that it did not, in fact, show, then he was lied to, he's a cat's paw, and the state does not have an honest belief, and we can't tell, because the state destroyed the evidence- He would be whose cat's paw? He would, whoever told him that this is what the investigation showed. The state is a fairly amorphous- Yeah, well, he would be the cat's paw of whoever informed- Can you let Judge Breyby ask- I'm sorry, I'm sorry. If you're alleging a cat's paw, it has to be the cat's paw of somebody, not something, but it has to be somebody. That suggests a very, very extensive conspiracy. This man was the chief of staff to the governor. Okay, let me finish the question. That means that he has to be the- It can't just be that he's the cat's paw of the state of Alaska. The state of Alaska here is represented by individuals, starting with the governor, and this man is very, very close to the governor and wields an enormous amount of power, so if he's being manipulated by someone, who's he being manipulated by? My assumption is that he is being manipulated by whoever told him what the investigation shows, if, in fact, he truly believed that. This could be some lower-level person is using- Well, no, the two people who were in charge here were Mr. Malnick and Mr. Nisic, I think, and that Mr. Nisic was a nonpartisan employee, but Mr. Malnick, I believe, was not. But it can only be an honest belief if whoever told him also honestly believed it, and we have no way of testing that because we have no way- This is an extraordinary story of a conspiracy that doesn't seem to have any basis in fact. No, Your Honor. I don't see any facts. I see lots of inferences and lots of things that we could imagine, but I don't see any evidence for any of this. Your Honor, we're not alleging a conspiracy, but we are saying there is no way to demonstrate that he had an honest belief. You can't ignore the fact that- We cannot ignore the fact that we have no way of knowing what the investigation showed. It may have contained nothing other than gossip. You already acknowledged, I think, in response to my earlier question, that the report was not helpful to your client. So if he read it and he believed it, why isn't that an honest belief? Well, for one thing, we don't think he read it. Okay, so he got a summary of it and he believed it then. It's not an honest belief if the people who told him what it showed did not also honestly believe it. It was not helpful to your client. So if we can take as given that it was not helpful to your client, then how do we get to him having a belief that's wrong if all he believes is it's not helpful to your client? If he believed it because he was told by other employees of the state that it was reliable, then it is not an honest belief. And we have no way of testing whether it's an honest belief because the state intentionally prevented Ward and her counsel from seeing this. First of all, Ward was never interviewed in the investigation, which itself is a little suspicious, but we can't really take much from that. But the state had this on a privilege log stating that it was privileged information that they couldn't reveal. And then they claim they never took possession of the evidence and they allowed it to be destroyed. Interestingly, in the same year, the privilege log was created. And even after having an order from the administrative judge to produce the evidence that was requested in discovery, which included the Zeruba report and the 30 documents and 30 tangible objects, they first told the trial judge they had complied with their order even though and did not mention that they had not attached the exhibits until counsel brought it up. And only literally the morning of the trial did they actually admit to the Birch Horton report, which summarized the legal basis for the Zeruba report. In all of the evidence that's been amassed here on one side or the other, the one thing that seems to jump out from the page is the press conference that your client holds. This is a public document. Doesn't require anybody to tell somebody else something else. There's no hearsay involved. There's no back reports. There's no destruction of evidence. So how do we get around this very, very obvious, what appears from the page to leap out as an extremely disloyal set of statements from Governor Echols' Anchorage head? It was certainly an inadvisable thing to do, but Mr. Ryan testified explicitly that that is not the reason why he terminated Ms. Ward. He said, I should have told her to go home or go away, but I didn't. If he testified that that is not what he relied on, that cannot be what he relied on to terminate Ms. Ward. If you want to save time for rebuttal, I think we better let you stop and we'll hear from the other side. Okay, thank you. All right. Good morning, afternoon, wherever we are. May it please the court, my name is Robert Cutchin, here representing the state of Alaska. I plan to talk for 10 minutes and then I'll turn it over to counsel for the commission. This is a cross petition, so Ward and the state both raised some issues in a second. I'll turn to Ward's petition and focus almost all my time there, hopefully. But I first want to know two things briefly about the state's petition. First, the parties now agree that the monetary discovery sanctions against the state should be vacated under a sovereign immunity analysis, similar to the one in Plaskett v. Wormuth. Unless I get questions about that, I'll let the party's agreement speak for itself and rest on the briefing. Second, the state's position is that sovereign immunity bars the current version of Ward's claim for the reasons explained in the briefing, but the state recognizes that a more straightforward way to resolve the case might be to affirm the commission's decision on the merits. So in light of the questions that have been asked, I'll just jump into that and we can turn to sovereign immunity later if there are questions. So turning to Ward's petition and the merits, the agency has now issued a straightforward decision concluding that when the state terminated Ward, it did not violate GERA by retaliating against her for engaging in protected activity. Rather, it fired Ward for misusing state resources and political disloyalty. To show that that finding is supported by substantial evidence, I want to work through three issues. First, I'll briefly touch on the discovery dispute because it's related to the scope of the record. And then I'll turn to the evidence and highlight some of the evidence supporting the commission's decision. And then I briefly want to address the fact that there's very little evidence supporting Ward's theory of, as Judge Bybee called it, a potential conspiracy. So the point I want to make in the next few minutes is that there's a lot of different evidence supporting the commission's decision. It's not just relying on one single document or something. And Ward seems to recognize this, which brings me to my first point, the discovery dispute. Ward's correct appraisal about the weakness of her evidentiary argument seems to explain why she's trying so hard to leverage the discovery dispute to hide evidence from the court that was before the commission. The state ward and the commission all read the reports that were excluded and from the ALJ's characterization of them. We know that they more or less supported the state's position that decision makers believed Ward had been disloyal politically and had misused state resources. So by asking for an adverse inference to the contrary, Ward is knowingly asking the court to suppress the truth about these documents. But beyond that, her argument fails under the deferential abuse of discretion standard. She hasn't pointed to a single case involving similar relief under similar circumstances. And as the commission's findings show, the state did not act in bad faith during the discovery dispute. In this situation, the court should not ignore the merits of the case and resolve this based on a discovery dispute. The upshot is that the court should just review all the evidence that was before the commission and decide whether or not its findings are supported by substantial evidence. So I understand your arguments that the ALJ had discretion about what should be done about this evidence not existing anymore and that we should defer to that and why it should be upheld. But I'm confused about whether you're still also asserting that there was no duty to preserve these exhibits in the first place. I... The state's position is that those were accidentally destroyed. It may have had a duty to preserve them. But even if it did, given the other factual findings, that there was no bad faith on behalf of the state in the destruction of the documents, that it was well within the ALJ's discretion to not award the harsh sanction that they asked for. So even assuming that the state had some duty to preserve those, that doesn't mean that their destruction requires ending this case before getting to the merits. So the Supreme Court has said that the, quote, threshold for substantial evidence is not high. So even if the court disagrees with aspects of the decision or may have weighed some of the evidence differently, it should still affirm the commission as long as there's some evidentiary support for the claim that Ward failed to prove the causation element of retaliation. The record shows that the state was concerned about Ward's disloyalty at least six months before she engaged in any arguably protected activity. We know this because the governor's chief of staff sent a memorandum to high-level officials warning them not to campaign with state resources. And that was sent because he had heard the rumors about Ward. The chief of staff also called Ward to discuss the rumors and figure out what was going on in her office. Again, this all happened before she engaged in any activity that was arguably protected. It was only after Ward was confronted that she began engaging in activity that may be protected under GARA. And at that point, the state more or less did what Ward asked it to do. It sent the state's HR people to investigate her claims of misconduct. They interviewed over 20 people, concluded, as Ward partly alleged, that there had been some misconduct, and it reprimanded the offender. But during that sexual harassment investigation, the governor's office also heard rumors that Ward was misusing state resources or at least being disloyal. Quotes from that evidence are collected on page 8 of the state's first brief. Then the governor called Ward personally to confront her about the perceived political disloyalty that conversation is memorialized in a document written by Ward, which is also in the record. Ward then went on television. It seems like there's a little bit of slipperiness going from misuse of government resources to disloyalty. It would have been easier for you to just argue disloyalty all along here. I'm not quite sure whether you're trying to shift to that now. I'm not trying to shift to that now. Political disloyalty and misuse of resources are sort of warp and weft in this case. The only theory of the main theory of political disloyalty was that she had used state resources by creating this list, the mailing list, and that that was used for the purpose of supporting an insurgent political candidate. So the political disloyalty sort of goes hand in hand with the misuse of state resources. They're affected. There's no other theory of how she used state resources in a way to benefit herself other than for her political career and that of other politicians. And what do you think Ryan was talking about when he referred to the investigation? I believe that that was the investigation. There were three investigations. There was the investigation performed by Zeruba. There was the summary of that for Burt Horton. Maybe those are the same. And then there's the internal sexual harassment investigation, which uncovered more rumors about Ward's misbehavior. And then after that, Nizick instructed Bob Helm to go check the computers. And so that flows from things that were learned during the sexual harassment investigation, but it's an internal investigation. What was the evidence that came out during the sexual harassment investigation that was about disloyalty and misuse of resources? There were at least five people who said that they believed that the harassment complaint itself was retaliation for being confronted with the rumors. So in those statements, and I can pull up quotes from the brief, but they say things like, Ward's being disloyal. So here's a quote. Bob responded, there was some office unrest, but it was related to Ward's loyalty. So that was a statement from while they were investigating the harassment, people were saying that Ward was disloyal. Here's another one. Wanda thinks the Jones complaint is retaliation related to a separate issue, maybe related to professional loyalties. And there's three or four more of those. So there were these convergent rumors that were coming out during the sexual harassment investigation, pointing to the fact that Ward was being disloyal, and those people were connecting the two. And so that triggered this internal investigation into the disloyalty, because it had confirmed rumors that the governor's office has heard elsewhere. So taking all of this together, the position of the governor's office was more or less the same. Before, during, and after Ward engaged in activity that could be protected under GERA. During each of those time periods, people were very concerned that she was misusing state resources in a way that was politically disloyal. And she was eventually fired for that reason, as the termination memorandum explains. The third point I wanted to make is that Ward offers almost no meaningful positive evidence that the stated reason for firing her was pretext. She has cited her own testimony, which was expressly discredited by the commission. And she also tries to rely on speculation about the timing and the sequence of events. But as I've already said, the state's position was more or less the same. Before, during, and after Ward engaged in activity that might be protected under GERA. The mere fact that she was fired after engaging in some protected activity, absent any other positive evidence of pretext, is not enough to overturn the commission's factual findings, when all that's required is substantial evidence. In sum, Ward was fired for political disloyalty and misusing state resources, which is not a violation of GERA. That finding is supported by substantial evidence. Unless there are any questions, the state asks the court to one, vacate the monetary discovery sanctions, and two, either affirm the agency's decision on the merits, or conclude that Ward's claim is barred by sovereign immunity for the reasons in the briefing. That's my 10 minutes. Thank you. Thanks. Good morning. And may it please the court, Courtney Dixon from the commission. My friend from Alaska has essentially covered the ground here. I'll just underscore a couple of things. One, again, substantial evidence standard. And the question Judge Friedland, as you had asked, is not, you know, did or did not Miss Ward actually misuse state resources? But did the state genuinely believe that she did? And did it terminate her for that reason, or rather a protected reason? And substantial evidence supports the agency's conclusion that the state's reason was the true reason. And for that reason, Miss Ward's petition should be denied. Do you have an explanation for why it took the EEOC decades to decide this case? I don't, Your Honor. But obviously, we have the final decision before us now, and it was correctly decided. Are there other GERA cases? And do they also take this long? I'm not aware. I do know that there's not that many GERA cases, but I can't say how long they take on average. Does the EEOC have its own ALJs now? I'm not aware of that either. I don't have any questions. I don't think we have further questions. Thanks very much. I have to begin by repeating that there is no actual evidence in the record that supports an honest belief. And we actually, although there's the summary of the Zurub report, purports to state what is in the evidence. We believe there may well have been exculpatory evidence that was included. And we think that this was intentionally withheld. Why on earth would it be included in the privilege log for 17 years before they were finally forced to disgorge something that they claim they destroyed? There's no actual evidence. And there is no way that Ward could adequately defend herself without knowing what this investigation was based on. It seems to me that, well, we know from Ward's testimony that the state began to sort of circle the wagons the minute the sexual harassment complaint appeared. She had a call from a state senator's aide telling her to back off. She had, Jerry Sanders was told by the governor that he had locked Ward out of the office because of the sexual harassment complaint. And all of these so-called, if the state really believed that they were firing her because of the rumors, they would have said so instead of concocting an investigation. Because, of course, the governor could have fired her for any non-discriminatory purpose. The spoliation was complete. She was never interviewed. They attempted to hide it. And in contrast to the way this report was maintained, the sexual harassment report and all the evidence was preserved in a locked drawer. You would think that something as important as misuse of state resources would be treated the same way. We think that it's possible the actual affidavits and interview reports might have been exculpatory. It is entirely possible that Zoruba only put in some of what was contained. It's obviously not a complete record of what they learned. For example, the interview report with Leola Rutherford. The attachments, the report is not helpful. But the attachments might have been helpful. And Ms. Ward, the state's highly negligent, if not purposeful. And we related in the brief the reasons why we actually believe there's bad faith here. But the state's destruction or loss of the evidence is to allow the judge to permit testimony about the contents of this investigation. It's just, in our view, the kind of spoliation that demands reversal and another- You're over your time. Can you get concluding- I am. I think, well, basically, when you spun yourself dry, you shut yourself off. Thank you very much, Your Honor. Thank you both sides for the helpful arguments. This case is submitted. And we are adjourned for the day.
judges: BYBEE, FRIEDLAND, MILLER